[Cite as *Michalek v. Ohio State Univ. Wexner Med. Ctr.*, 2024-Ohio-1889.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Kyle Michalek, [as Administrator of the
Estate of Stephanie L. Michalek, Deceased]
et al.,                                                      :

                               :                    No. 22AP-563

             Plaintiffs-Appellants,     :       (Ct. of Cl. No. 2020-00497JD)

v.                                 :       (REGULAR CALENDAR)

The Ohio State University Wexner
Medical Center,                   :

                                   :

            Defendant-Appellee.      :

                                   :

D E C I S I O N

Rendered on May 16, 2024

**On brief:** *Elk & Elk Co, Ltd.*, and *R. Craig McLaughlin*, for appellants. **Argued:** *R. Craig McLaughlin*.

**On brief:** *Arnold Todaro Welch & Foliano, Co., L.P.A, Gregory B. Foliano*, and *Grier D. Schaffer*, Special Counsel for the Ohio Attorney General and Co-Counsel for appellee. **Argued:** *Gregory B. Foliano*.

APPEAL from the Court of Claims of Ohio

JAMISON, J.

    **{¶ 1}** Plaintiff-appellant, Kyle Michalek, appeals a judgment of the Court of Claims of Ohio in favor of defendant-appellee, the Ohio State University Wexner Medical Center ("OSUWMC"). For the following reasons, we reverse that judgment and remand for a new trial.

## I. FACTS AND PROCEDURAL HISTORY

    **{¶ 2}** On February 22, 2019, Kyle and Stephanie L. Michalek were preparing for the next day's gender reveal party for their first child. Stephanie, who had previously

suffered two miscarriages early in the first trimester, was 29 weeks pregnant. Kyle and Stephanie had invited 70 of their friends and family members to celebrate their baby's arrival at their new house in Utica, Ohio.

{¶ 3} As Stephanie, Kyle, and their family readied Kyle and Stephanie's house for the party, Stephanie began feeling sick. Kyle's mom, Lisa Michalek, urged Stephanie to lie down and rest. When Lisa checked on Stephanie 15 minutes later, Stephanie told Lisa that she was feeling worse. Lisa and Stephanie agreed that Stephanie needed to go to the emergency room.

{¶ 4} Kyle reacted immediately because, up until then, Stephanie had never sought unplanned medical treatment during her pregnancy. Without delay, Kyle drove Stephanie to Knox Community Hospital in Mount Vernon, Ohio. Stephanie reported to the hospital staff that she was suffering from severe abdominal pain and nausea, having vomited after she arrived at the hospital. Dr. Michael Sullivan, an obstetrician gynecologist at Knox, evaluated Stephanie but could not determine what was causing her symptoms. According to Kyle, Dr. Sullivan told Kyle and Stephanie that "something[ ] [was] obviously wrong, but [he was], at [that] point, unsure what it [was], so [he] recommend[ed] that [Stephanie] transfer * * * to a facility with better capabilities to be able to handle whatever scenario may come to pass, and then at that point [he] informed [Kyle and Stephanie] that [he] would like to transport [Stephanie] via helicopter to Ohio State." (Tr. Vol. 2 at 317.)

{¶ 5} Before the transfer, Dr. Sullivan spoke with Dr. Stephen Gee, an obstetrician gynecologist in his first year of maternal-fetal-medicine subspecialty training at OSUWMC. Dr. Gee authorized Stephanie's transfer to OSUWMC and informed Dr. Patrick Schneider, the attending physician supervising the physicians of the labor and delivery unit, that Stephanie would be arriving at OSUWMC. According to Dr. Schneider, Stephanie's transfer was urgent because her referring physician had been unable to determine the source of Stephanie's severe abdominal pain.

{¶ 6} Early in the morning of February 23, 2019, an air medical transport flew Stephanie to OSUWMC. On that morning, the OSUWMC labor and delivery unit was staffed with a physician team consisting of Dr. Schneider, a maternal-fetal-medicine specialist; Dr. Gee, a maternal-fetal-medicine fellow; a fourth-year resident; Dr. Emily

Cassell, a third-year resident; a second-year resident; and Dr. Alexandra Bell, a first-year resident. Drs. Bell, Cassell, and Gee comprised Stephanie's treating team.

{¶ 7} Stephanie arrived at OSUWMC's labor and delivery triage unit at 5:20 a.m. Dr. Bell reviewed with Stephanie her symptoms and medical history, performed a physical examination of Stephanie, and evaluated Stephanie's vital signs. At that time, Stephanie's abdominal pain remained severe, and she had vomited numerous times. Stephanie reported to Dr. Bell that her pain had moved from the top of her abdomen to her belly button.

{¶ 8} In the first five blood pressure readings taken at OSUWMC (from 5:20 a.m. to 5:38 a.m.), Stephanie's systolic blood pressure exceeded 160. A pregnant woman with a systolic blood pressure over 160 has severe hypertension. On top of that, Stephanie's urine tested positive for protein, meaning she had proteinuria. Stephanie's severe hypertension and proteinuria caused Drs. Bell and Cassell to diagnose Stephanie with preeclampsia with severe features.

{¶ 9} Preeclampsia occurs when the blood vessels that supply the placenta do not develop or work properly. The fetus demands more resources from the mother through a process that constricts the mother's blood vessels, resulting in increased maternal blood pressure. Preeclampsia can compromise blood flow to the mother's kidneys, which can cause proteinuria, and to the brain, which can cause eclampsia, i.e., a seizure. Restricted blood flow can also damage the mother's heart, lungs, and liver. The only cure for preeclampsia is the delivery of the baby and the placenta.

{¶ 10} Drs. Bell and Cassell treated Stephanie's severe hypertension with labetalol, but Stephanie's systolic blood pressure remained above 160. Drs. Bell and Cassell then increased the dosage of labetalol, which finally lowered Stephanie's systolic blood pressure under 160.

{¶ 11} Dr. Bell met with Stephanie and Kyle, who had joined Stephanie in the labor and delivery triage unit, and informed them of the preeclampsia diagnosis. Although Kyle remained with his wife throughout the entire time she was in the triage unit, he does not recall interacting with any physician other than Dr. Bell. Dr. Bell had graduated from medical school in 2018, and she was only seven months into her first year as a resident when she treated Stephanie.

{¶ 12} Stephanie had complained of pain near her belly button.  Because the location of Stephanie's pain was not typical of preeclampsia with severe features, Drs. Bell and Cassell decided to investigate other potential causes of the pain through an ultrasound.  At 7:54 a.m., Stephanie was taken to the radiology department for the ultrasound.

{¶ 13} At 8:00 a.m., the maternal-fetal-medicine physician team going off shift had a "board sign-out" meeting with the maternal-fetal-medicine physician team coming on shift.  (Tr. Vol. 3 at 574.)  At a board sign-out meeting, the departing physicians review the status of the patients in the labor and delivery unit with the arriving physicians.

{¶ 14} Dr. Schneider, the attending physician supervising the departing physician team, first learned that Stephanie had arrived at OSUWMC at the board sign-out meeting.  Although Stephanie was a high-risk patient, Dr. Schneider was not informed of Stephanie's arrival at OSUWMC at 5:20 a.m.  During the next 2 hours and 40 minutes, he did not examine or speak with Stephanie, and no one kept him abreast of changes in Stephanie's medical condition.  At the 8:00 a.m. board sign-out meeting, Dr. Schneider learned for the first time that Stephanie had been diagnosed with preeclampsia with severe features.  In addition to informing Dr. Schneider of this diagnosis, Stephanie's treating team told Dr. Schneider about her medical condition and their treatment of Stephanie.

{¶ 15} Dr. Schneider agreed with the medical decisions the treating team had made and the plan of care they had developed.  However, had Dr. Schneider known of Stephanie's severe hypertension when it was diagnosed, he would have preferred to treat Stephanie with magnesium sulfate.  Magnesium sulfate reduces the risk of seizure in women with preeclampsia.  When cosigning the history and physical examination note completed by Dr. Bell, Dr. Schneider supplemented it by adding the provision that, "[i]f there is a worsening of [Stephanie's] condition[,] will start magnesium for * * * maternal seizure prophylaxis." (Jt. Ex. 3 at 8.)  After writing this note at 8:14 a.m., Dr. Schneider waited for Stephanie to return from her ultrasound so he could examine her and explain the plan of care.  Consistent with Dr. Schneider's note, Dr. Bell ordered magnesium sulfate for Stephanie at 8:23 a.m.

{¶ 16} At 8:35 a.m., Stephanie reached the labor and delivery unit.  Stephanie's husband, Kyle, joined her in her room in the labor and delivery unit.  Stephanie walked a few feet between the bed she arrived on to the labor and delivery bed.  A few minutes later,

at 8:42 a.m., Stephanie said she needed to vomit and rolled to her left side. According to Kyle, Stephanie then began "snoring very loudly." (Tr. Vol. 2 at 323.) The nurse in the room recognized this as a sign Stephanie was seizing and called for the charge nurse and a physician. The physician and nurses yelled Stephanie's name, trying to rouse her. Kyle never saw or heard Stephanie respond. However, the medical record states that at 8:44 a.m., Stephanie "responded to [the physician's] verbal stimulation." (Jt. Ex. 3 at 20.) Kyle was told to leave the room, and as he was walking out, "there [was] a person on top of Stephanie beginning chest compressions because clearly they had noted that at this point her heart was no longer beating." (Tr. Vol. 2 at 324.) Indeed, the medical record reflects that at 8:45 a.m., Stephanie stopped breathing and had no palpable pulse. A code blue was called, and chest compressions were started.

{¶ 17} Dr. Schneider was at a workstation a short distance from Stephanie's room when he heard the code blue. He rushed to Stephanie's room and was told that she had had an eclamptic seizure and had gone into cardiac arrest. When Stephanie remained unresponsive after four minutes of chest compressions, Dr. Schneider decided to perform a cesarean section. A.E.M., Stephanie and Kyle's son, was born at 8:53 a.m. Although efforts to resuscitate Stephanie continued for another hour, they were unsuccessful. Stephanie died at 9:56 a.m. on February 23, 2019.

{¶ 18} On the day of Stephanie's death, Kyle saw his son briefly before A.E.M. was rushed to the neonatal-intensive-care unit ("NICU"). A.E.M. was so small Kyle thought A.E.M. could have probably fit in the palm of his hand. For the next 49 days, A.E.M. received treatment in the NICU, which was on the same floor as the room where his mother had died. To see his son, Kyle had to ride the same elevator and go through the same doors as he had on the morning of Stephanie's death. But Kyle visited A.E.M. every day A.E.M. was in the NICU because he knew his son needed him.

{¶ 19} Kyle's parents quit their jobs, sold their home in North Carolina, and moved to Kyle's home in Utica so they could help Kyle care for A.E.M. They stayed with Kyle and A.E.M. for the next two and one-half years. A.E.M. is now a happy, healthy preschooler.

{¶ 20} Dr. Schneider signed Stephanie's death certificate on February 27, 2019 as the certifying physician. On the death certificate, Dr. Schneider listed the immediate cause of death as cardiac arrest (occurring 76 minutes before death). Dr. Schneider listed the

underlying causes of death as suspected amniotic fluid embolism (occurring 77 minutes before death), placental abruption from severe preeclampsia (occurring 77 minutes before death), and eclamptic seizure (occurring 78 minutes before death).

{¶ 21} An autopsy on Stephanie's body was performed at OSUWMC. The autopsy report states that, "[b]ased on the clinical history and anatomic findings, the most likely immediate cause of death was sudden cardiac death due to fatal arrhythmia in the setting of eclampsia." (Jt. Ex. 3 at 111.)

{¶ 22} Kyle was appointed administrator of Stephanie's estate. On August 13, 2020, Kyle filed suit against OSUWMC, alleging claims for medical negligence for the injuries suffered by Stephanie, wrongful death of Stephanie, medical negligence for the injuries suffered by A.E.M., loss of consortium, and negligent infliction of serious emotional distress. A bench trial on these claims occurred on April 11, 12, 13, and 14, 2022. Immediately prior to trial, Kyle withdrew his claim for negligent infliction of serious emotional distress. After Kyle finished presenting his evidence at trial, the trial court granted OSUWMC a directed verdict on the claim for medical negligence for the injuries suffered by A.E.M.

{¶ 23} At trial, Kyle introduced the expert testimony of Dr. Martin Gubernick, a board-certified obstetrician gynecologist. Dr. Gubernick stated that the physicians at OSUWMC breached the standard of care they owed to Stephanie in two ways: (1) Dr. Schneider, the attending physician, failed to evaluate Stephanie after her arrival at OSUWMC, and (2) Stephanie's treating team failed to administer magnesium sulfate.

{¶ 24} Dr. Gubernick pointed out that, until Stephanie suffered a seizure, the only OSUWMC physician to see Stephanie was a first-year resident. Approximately three hours passed before Dr. Schneider became aware that Stephanie—a high-risk patient under his care—was at the hospital.

{¶ 25} Additionally, according to Dr. Gubernick, the standard of care required Stephanie's treating team to treat Stephanie's severe preeclampsia with magnesium sulfate. Dr. Gubernick testified that if Stephanie had received magnesium sulfate after her diagnosis with preeclampsia with severe features, then she most likely would not have suffered an eclamptic seizure. Dr. Gubernick stated that receiving magnesium sulfate therapy reduces the risk a patient with preeclampsia will suffer an eclamptic seizure by

three to ten times. Moreover, Dr. Gubernick opined that Stephanie's eclamptic seizure caused the arrhythmia that led to her cardiac arrest. Dr. Gubernick thus testified that if Stephanie had received magnesium sulfate in the triage unit, then she would not have died.

{¶ 26} OSUMWC called two expert witnesses to rebut Dr. Gubernick's opinions. Dr. Ashi R. Daftary, a maternal-fetal-medicine specialist, testified that no breach of the standard of care occurred because Dr. Schneider did not evaluate Stephanie upon her arrival at OSUMWC. Dr. Daftary opined that OSUMWC provided Stephanie reasonable care because a third-year resident and maternal-fetal-medicine fellow participated in evaluating and treating Stephanie. Dr. Daftary also testified that Stephanie's treating team did not breach the standard of care by deferring treatment with magnesium sulfate. Dr. Daftary explained that under the standard of care, magnesium sulfate is used as a seizure prophylaxis during the intrapartum period, i.e., during labor and delivery, and the postpartum period, i.e., within 24 hours after birth. During Stephanie's stay in the triage unit, she was not in labor and no decision had been made to perform a cesarean section. Consequently, Stephanie was not within the intrapartum period where the standard of care called for treatment with magnesium sulfate.

{¶ 27} According to Dr. Daftary, Stephanie died because her severe preeclampsia narrowed her blood vessels, which reduced the blood flow to her heart, and this, in turn, caused arrhythmia and sudden cardiac arrest. Dr. Daftary stated that death from an eclamptic seizure is rare, and typically occurs either when a patient suffers recurrent seizures or a prolonged seizure. Dr. Daftary opined that Stephanie did not have a prolonged seizure that would have resulted in hypoxia (reduced oxygen levels in the heart tissues) and then arrhythmia leading to death. Also, Dr. Daftary explained that if Stephanie had died from a prolonged seizure, her organs would have shown evidence of swelling or necrosis during her autopsy, but no such evidence existed. Consequently, Dr. Daftary opined that Stephanie's seizure and arrythmia were separate events. Because Stephanie's death did not result from her seizure, Dr. Daftary concluded that magnesium sulfate would not have prevented her death.

{¶ 28} OSUMWC's second expert witness, Dr. Baha Sibai, also testified that the OSUWMC physicians met the standard of care in their treatment of Stephanie. Additionally, Dr. Sibai, a maternal-fetal-medicine specialist, opined that Stephanie's

seizure did not cause her death. According to Dr. Sibai, death from an eclamptic seizure only occurs when a patient seizes for at least ten minutes, resulting in hypoxia that causes arrhythmia. The evidence adduced at trial indicates that Stephanie's seizure lasted approximately three to four minutes. Dr. Sibai concluded that Stephanie died when her severe preeclampsia caused reduced blood flow to her heart, resulting in acute hypoxia, which caused a cardiac arrest.

{¶ 29} Separately, Dr. Sibai opined that even if Stephanie had received magnesium sulfate in the labor and delivery triage unit, she more likely than not would still have had a seizure. Dr. Sibai stated that magnesium sulfate reduces the risk of seizure but does not prevent all seizures. Dr. Sibai participated in the Magpie Trial, which is the preeminent trial in the use of magnesium sulfate as a seizure prophylaxis in women with preeclampsia. The Magpie Trial showed that, in western countries, magnesium sulfate reduces the rate of seizure in women with preeclampsia from 0.8 percent to 0.5 percent. Because—as the Magpie Trial demonstrated—magnesium sulfate only reduces the rate of seizure by 33 percent in women in western countries, Dr. Sibai concluded that Stephanie's seizure was more than likely unpreventable.

{¶ 30} However, Dr. Sibai also conceded that the results from the Magpie Trial could be construed to support Dr. Gubernick's assertion that women with preeclampsia who are given magnesium sulfate are three times less likely to suffer an eclamptic seizure. Dr. Sibai admitted that when the results from all the countries that participated in the Magpie Trial are taken into consideration, the Magpie Trial showed that magnesium sulfate reduces the risk of seizure in women with preeclampsia by threefold, as Dr. Gubernick testified. Significantly, based on the overall results of the Magpie Trial as set forth by Dr. Sibai, women with preeclampsia who receive magnesium sulfate have over a 50 percent lower risk of developing eclampsia than women who do not receive magnesium sulfate.

{¶ 31} Thus, although the trial provided conflicting testimony about whether magnesium sulfate would have saved Stephanie's life, no party disputes the following: (1) Dr. Schneider, the attending physician on duty at OSUMWC, was unaware of Stephanie's arrival despite the fact she was flown in before dawn via air medical transport; and (2) Dr. Sullivan considered Stephanie's case to be so severe that it required emergency intervention exceeding his capabilities.

{¶ 32} In a decision entered August 17, 2022, the Court of Claims addressed Kyle's claims for medical negligence and wrongful death first. The court found that the standard of care dictated the use of magnesium sulfate from the onset of labor, during delivery, or for 12 to 24 hours after childbirth. Prior to Stephanie's seizure, she was not in labor and no decision had been made to perform a cesarean section. Consequently, the court concluded that the OSUWMC physicians did not violate the standard of care by deferring the use of magnesium sulfate.

{¶ 33} However, the Court of Claims found that the standard of care required OSUWMC's staff to notify Dr. Schneider of Stephanie's presence at OSUWMC when she arrived, and also required Dr. Schneider, as attending physician, to supervise Stephanie's case. The court determined:

> [T]here is simply no evidence that Dr. Schneider actually "supervised" Stephanie's case after Stephanie was admitted to OSUWMC. The evidence shows that Dr. Schneider was not even made aware of Stephanie's presence at OSUWMC until about three hours had passed following Stephanie's admission to OSUWMC. Were Stephanie not an emergency patient, the Court might treat this failure differently, but she clearly was, and time was of the essence.

(Aug. 17, 2022 Decision at 16.)

{¶ 34} Thus, the Court of Claims concluded that the failure of OSUWMC's staff to notify Dr. Schneider of Stephanie's presence, and the subsequent failure of Dr. Schneider to supervise Stephanie's case breached the standard of care. Nevertheless, the court did not find OSUWMC liable for medical negligence or wrongful death because the court did "not conclude that [OSUWMC's] staff's or Dr. Schneider's negligence constituted the proximate cause of Stephanie's injury or death, or both." (Aug. 17, 2022 Decision at 16.) The court further found that Kyle could not recover on his claim for loss of consortium because he had not proven his claims for medical negligence or wrongful death.

{¶ 35} In the end, the Court of Claims found that Kyle failed to prove any of his claims. Consequently, in a judgment entry dated August 17, 2022, the court entered judgment for OSUWMC.

## II. ASSIGNMENT OF ERROR

{¶ 36} Kyle now appeals the August 17, 2022 judgment, and he assigns the following error for our review:

> THE TRIAL COURT ERRED IN RULING THAT THE
> NEGLIGENCE OF THE OHIO STATE UNIVERSITY
> WEXNER MEDICAL CENTER DID NOT PROXIMATELY
> CAUSE AN INJURY TO STEPHANIE MICHALEK AND HER
> DEATH.

## III. STANDARD OF REVIEW

{¶ 37} By his assignment of error, Kyle contends that the Court of Claims' judgment is against the manifest weight of the evidence. The standard of review for manifest weight of the evidence is the same in both criminal and civil cases. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 17. The phrase "manifest weight of the evidence" "relates to persuasion." *Id.* at ¶ 19. It " 'concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis omitted.) *Id.* at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). In reviewing a judgment under the manifest weight standard, an appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed, and a new trial ordered. *Id.* at ¶ 20. "Sitting as the 'thirteenth juror,' the court of appeals considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion." *State v. Jordan*, ___ Ohio St.3d ___, 2023-Ohio-3800, ¶ 17, quoting *Thompkins* at 388. When a trial judge, instead of a jury, is the factfinder in a civil case, two of the three appellate judges may reverse a judgment based on the manifest weight of the evidence. App.R. 12(C)(1); *Eastley* at ¶ 7.

## IV. LEGAL ANALYSIS

{¶ 38} To establish a claim for medical negligence and a claim for wrongful death based on a negligence theory, a plaintiff must show: (1) the existence of a duty, (2) breach of that duty, and (3) the breach proximately caused injury or death, and (4) damages.

*Cromer v. Children's Hosp. Med. Ctr.*, 142 Ohio St.3d 257, 2015-Ohio-229, ¶ 23 (setting forth the elements of a claim for medical negligence); *Estate of Ridley v. Hamilton Cty. Bd. of Mental Retardation & Dev. Disabilities*, 102 Ohio St.3d 230, 2004-Ohio-2629, ¶ 14 (setting forth the elements of a claim for wrongful death based on a negligence theory). A physician owes his patient a duty "to exercise the degree of care that a medical professional of ordinary, skill, care, and diligence would exercise under similar circumstances." *Cromer* at ¶ 27. If a plaintiff proves a physician breached this duty, the trier of fact must then determine whether that breach proximately caused injury or death. Proximate cause means " 'some reasonable connection between the act or omission of the defendant and the damage the plaintiff has suffered.' " *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*, 73 Ohio St.3d 609, 618 (1995), quoting Prosser & Keeton, *Law of Torts*, Section 41, 263 (5th Ed.1984). "The rule of proximate cause 'requires that the injury sustained shall be the natural and probable consequence of the negligence alleged; that is, such consequence as under the surrounding circumstances of the particular case might, and should have been foreseen or anticipated by the wrongdoer as likely to follow his negligent act.' " *Jeffers v. Olexo*, 43 Ohio St.3d 140, 143 (1989), quoting *Ross v. Nutt*, 177 Ohio St. 113, 114 (1964) (further quotation and citation omitted).

**{¶ 39}** Under the doctrine of respondeat superior, a hospital is liable for the negligence of its employees. *Berdyck v. Shinde*, 66 Ohio St.3d 573, 577 (1993). Here, OSUWMC admitted that it employed the individuals who provided medical care to Stephanie at OSUWMC, and those individuals acted within the course and scope of their employment while providing Stephanie medical care. Thus, OSUWMC must be held liable for any negligent acts of its employees.

**{¶ 40}** Important to this appeal, the Court of Claims determined that Dr. Schneider breached the standard of care by failing to supervise Stephanie's care and treatment upon her admission to OSUWMC. However, the court found that Dr. Schneider's breach did not proximately cause injury or death to Stephanie. On appeal, Kyle argues that the manifest weight of the evidence does not support this finding. Kyle points out that Dr. Schneider testified that he "[m]ost likely" would have prescribed magnesium sulfate for Stephanie if he had known that Stephanie's systolic blood pressure readings exceeded 160. (Tr. Vol. 1 at 115.) Kyle's expert witness, Dr. Gubernick, opined that if Stephanie received magnesium

sulfate soon after showing signs of severe hypertension, she, more likely than not, would not have suffered an eclamptic seizure. Furthermore, Dr. Gubernick opined, had Stephanie not seized, arrhythmia would not have occurred, and Stephanie would not have died. Stephanie's death certificate, completed by Dr. Schneider, substantiates Dr. Gubernick's opinion that an eclamptic seizure was the underlying cause of Stephanie's death. Additionally, the autopsy report states that "the most likely immediate cause of death was sudden cardiac death due to fatal arrhythmia *in the setting of eclampsia*." (Emphasis added.) (Jt. Ex. 3 at 111.) Based on this evidence, Kyle argues, Dr. Schneider's failure to supervise Stephanie's care—which would have resulted in her timely receiving a life-saving medication—proximately caused her death.

{¶ 41} OSUWMC offered contradictory evidence regarding proximate cause. Dr. Sibai testified that, even if Stephanie had received magnesium sulfate after the spike in her blood pressure, she more likely than not would still have suffered a seizure. Additionally, both Drs. Sibai and Daftary explained that Stephanie died because of a sudden cardiac arrest caused by the effects of severe preeclampsia (the narrowing of the blood vessels and/or restriction of blood flow) and not the seizure. Consequently, magnesium sulfate, which reduces the risk of eclamptic seizure, could not have prevented Stephanie's death. Based upon this evidence, OSUWMC argues that Dr. Schneider's failure to supervise—and prescribe magnesium sulfate—did not proximately cause Stephanie's death.

{¶ 42} After considering the totality of the evidence, we determine that Kyle presented the greater amount of credible, competent proof regarding proximate cause. Kyle established that Stephanie's death was the natural and probable consequence of Dr. Schneider's failure to supervise Stephanie's care. The greater weight of the evidence demonstrates that Stephanie died because of an eclamptic seizure that triggered arrhythmia. In addition to Dr. Gubernick's testimony, both the death certificate and autopsy report cite eclamptic seizure—not preeclampsia—as the underlying cause of Stephanie's death. Moreover, the greater weight of the evidence establishes that magnesium sulfate prescribed by Dr. Schneider would have more than likely prevented Stephanie's seizure, thus saving Stephanie's life. Although Dr. Sibai testified differently, his testimony established that the overall data from the Magpie Trial shows that magnesium

sulfate reduces the risk of eclampsia in women with preeclampsia by over 50 percent. Therefore, applying the manifest weight standard, we conclude that Dr. Schneider's breach of the standard of care proximately caused Stephanie's death. Any finding to the contrary would constitute a manifest miscarriage of justice. We thus sustain Kyle's sole assignment of error.

## V. CONCLUSION

{¶ 43} For the foregoing reasons, we sustain Kyle's sole assignment of error, we reverse the judgment of the Court of Claims of Ohio, and we remand this cause to that court for further proceedings consistent with law and this decision.

*Judgment reversed;*
*cause remanded.*

LELAND, J., concurs.
BOGGS, J., dissents.

BOGGS, J., dissenting.

I respectfully dissent. While the majority's decision captures the tragedy of Stephanie Michalek's death, and how unfathomable it is that pregnancy can become a deadly condition, I cannot agree with its conclusion that the Court of Claims' decision is manifestly against the weight of evidence. In reversing the court's judgment as against the manifest weight of the evidence, the majority inappropriately ignores the competent, credible testimony of multiple experts and treating physicians that support the court's judgment, while substituting its own judgment in place of the Court of Claims.

The Supreme Court of Ohio has directed courts of appeals that in weighing the evidence, we must always be mindful of the presumption in favor of the finder of fact. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

> "* * * [I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *
>
> "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-92 (1978). An appellate court must defer to the trial court's factual findings because "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Id.* at 80. An appellate court will only reverse a judgment as being against the manifest weight of the evidence if it is not supported by some competent, credible evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 208 (1978).

As the majority decision correctly notes, the Court of Claims determined that Dr. Schneider breached the standard of care by failing to supervise Stephanie's care and treatment upon her admission to the Ohio State University Wexner Medical Center ("OSUWMC"). However, it also found that this negligence did not proximately cause her injury or death because Stephanie's treatment plan, and the care OSUWMC provided, met the standard of care.

In holding that the manifest weight of the evidence does not support the Court of Claims' determination regarding proximate cause, the majority's decision points to Kyle's reliance on Dr. Schneider's testimony that he likely would have prescribed magnesium sulfate if he had known Stephanie's systolic blood pressure readings had exceeded 160. The premise of Kyle's argument is his belief that Stephanie died because she had an eclamptic seizure that caused a heart arrythmia resulting in her cardiac arrest. Kyle's expert, Dr. Gubernick, offered an opinion that, had Stephanie received magnesium sulfate soon after showing signs of severe hypertension, she likely would not have suffered an eclamptic seizure, without which he opined the arrhythmia would not have occurred, and Stephanie would not have died.

The majority states, "applying the manifest weight standard, we conclude that Dr. Schneider's breach of the standard of care proximately caused Stephanie's death." (Maj. Decision at ¶ 42.) In reaching its conclusion, the majority finds that "[t]he greater weight of evidence demonstrates that Stephanie died because of an eclamptic seizure that triggered arrhythmia," and that, if administered to Stephanie, magnesium sulfate would have more than likely prevented her eclamptic seizure. *Id.* The majority, however, ignores the competent, contradictory evidence regarding proximate cause. Both Dr. Sibai and Dr. Daftary opined that Stephanie died because of a sudden cardiac arrest caused by the

effects of severe preeclampsia (the narrowing of the blood vessels and/or restriction of blood flow), not by a seizure, and that the administration of magnesium sulfate, which reduces the risk of eclamptic seizure, would not have prevented Stephanie's death.

With respect to the cause of Stephanie's death, there is no dispute that she suffered spontaneous cardiac arrest caused by a heart arrhythmia. What *is* disputed is what caused that arrhythmia. Notably, the Court of Claims does not make a finding related to whether Stephanie's arrhythmia was a consequence of an eclamptic seizure or the consequence of preeclampsia with severe features. This distinction is important because Kyle does not claim that the administration of magnesium sulfate would have prevented Stephanie's arrhythmia if it was indeed caused by preeclampsia. It is inappropriate for the majority to now determine that Stephanie's arrhythmia was caused by an eclamptic seizure when the court's decision is silent and there is overwhelming evidence going against the majority's decision.

Dr. Daftary, an obstetrician gynecologist with a subspeciality in maternal-fetal-medicine, testified that Stephanie's arrythmia was a result of the preeclampsia process causing "changes in blood flow to the tissues, including the heart tissues and that – that would have led to the decreased blood supply * * * and because of that[,] changes in the electrical rhythm of the heart." (Apr. 13, 2022 Tr. Vol. 4 at 452-53.)

Dr. Sibai, also an obstetrician gynecologist with a subspeciality in maternal-fetal-medicine, agreed with Dr. Daftary that Stephanie's arrythmia was a consequence of preeclampsia and explained why, in his opinion, it was unlikely that Stephanie even experienced an eclamptic seizure:

> I have never seen anywhere in the record or any description by anyone that she had what you call an eclamptic seizure * * * I have written a detailed description about how an eclamptic seizure happens. And it starts with the patient will roll her eyes -- and I do not see any evidence of the eyes being rolled -- the faces becomes congested and they develop jerky movements of the arms and the legs, and this really goes in steps * * * next step where the patient will have, like, a tetanic movement of the muscles * * * [t]he only thing is probably consistent probably the snoring that you see at the end * * * but it's not the classic eclamptic seizure that you expect to see.

(Apr. 14, 2022 Tr. Vol. 4 at 713-14.)

Inasmuch as the majority relies on Stephanie's death certificate and autopsy report to support its finding that her arrythmia was caused by an eclamptic seizure, Dr. Schneider who completed her death certificate disagreed with the majority's finding. He testified, "My leading suspicion as to the contributory effect to that cardiac arrest was a suspected amniotic fluid embolism and a mechanism for how that amniotic fluid embolism could have occurred. My inclusion of eclamptic seizure on the death certificate was simply to characterize a morbid event that occurred around the time that these events also occurred, very similar to how we would fill out a death certificate for a person who died of COVID-19 but had other comorbidities such as diabetes or had prior heart attack or had other preexisting medical conditions that while not the source of death were present around the time of death." (Apr. 13, 2022 Tr. Vol. 3 at 639.)

There is no dispute that magnesium sulfate would not have prevented Stephanie's arrythmia and cardiac arrest if the arrythmia occurred in the setting of preeclampsia and not because of an eclamptic seizure. Therefore, unless an eclamptic seizure caused her arrythmia, the question whether OSUWMC should have administered magnesium sulfate is irrelevant to the question of proximate cause. We should not now be making a finding in the first instance that Stephanie's arrythmia was caused by an eclamptic seizure, especially when the weight of the evidence overwhelmingly suggests otherwise.

Even though the Court of Claims jumped past answering the question as to what caused Stephanie's arrythmia, it correctly found that OSUWMC was not liable for breaching the standard of care as it relates to administering magnesium sulfate. Even assuming Stephanie's arrythmia was caused by an eclamptic seizure, as the majority would have us believe, the court appropriately found that the applicable standard of care did not require administration of magnesium sulfate prior to labor. This finding is clearly not against the manifest weight of evidence when every doctor, except appellant's expert, testified that it is not the standard of care to prescribe magnesium sulfate to women who are not intrapartum or postpartum.

Courts have held that when evidence includes testimony by competing experts with opposite opinions, a reviewing court should not reverse the trial court's decision for being manifestly against the weight of evidence. *See State v. Garrett*, 171 Ohio St.3d 139, 2022-Ohio-4218, ¶ 139 ("[w]hen the jury hears testimony from competing experts with opposite

opinions, such that the evidence was susceptible to more than one interpretation, as here, the jury's verdict is not against the manifest weight of the evidence"); *State v. Six*, 3d Dist. No. 9-23-14, 2023-Ohio-4361, ¶ 14, citing *Garrett*. In a case like this, the presumption in favor of the trier of fact's findings determines the outcome on appeal. *See Walker v. Ford Motor Co.*, 8th Dist. No. 100759, 2014-Ohio-4208, ¶ 53 (where expert witnesses testified to competing opinions on causation, the judgment was not against the weight of evidence given the presumption that the trier of fact's findings are correct); *Gysegem v. Ohio State Univ. Wexner Med. Ctr.*, 10th Dist. No. 20AP-477, 2021-Ohio-4496, ¶ 74 (holding the same with regard to expert testimony on standard of care).

Dr. Daftary testified that, in her opinion, "[m]agnesium sulfate, if it's to be used for seizure prophylaxis in the setting of severe preeclampsia or eclampsia, is used as what's called an intrapartum therapy, so during [the] delivery process * * * not having it started in triage is well within the standard of care." (Apr. 13, 2022 Tr. Vol. 3 at 423-24.) Further, Dr. Sabai testified, "we don't give magnesium sulfate in the prenatal period." (Apr. 14, 2022 Tr. Vol. 4 at 729.) Even Dr. Schneider testified that it is not the standard of care to provide magnesium sulfate prior to delivery, and that he was only considering it for Stephanie because he was testing a hypothesis:

> My preference [to administer magnesium sulfate] is based on my research and hypotheses that I have that I've been studying since 2016 and they do not reflect the standard of care across the country. They represent an emerging topic within the field and they would not be considered standard of care. Standard of care is to deliver it [magnesium sulfate] during the intrapartum course and postpartum course.

(Apr. 11, 2022 Tr. Vol. 1 at 114-15.)

The only doctor to testify that providing Stephanie magnesium sulfate was the standard of care was Dr. Gubernik. Yet he seemed to indicate that he was basing his opinion on the fact that he believed (incorrectly) that *Dr. Schneider* thought it was the standard of care: "I agree with Dr. Schneider, okay, that this patient required magnesium sulfate and I agree with him that that's the standard of care." *Id.* at 197; *see also*, *id.* at 138. But as the Court of Claims even pointed out to Dr. Gubernik, that was not Dr. Schneider's position on the standard of care. *Id.* at 197.

In this case, OSUWMC provided ample evidence to support the Court of Claims decision.  This court has previously held that it is improper for a court of appeals to decide expert witness credibility or how much weight to assign to experts' competing opinions. *Coulter v. Stutzman*, 10th Dist. No. 07AP-1081, 2008-Ohio-4184, ¶ 23.  Moreover, it was reasonable for the trial court to determine that Drs. Daftary and Sibai were more persuasive than Dr. Gubernick, and to give their opinions greater weight in making its decision.  First, as the Court of Claims pointed out, Drs. Daftary and Sibai were both maternal fetal specialists, while Dr. Gubernick did not have any advanced training in maternal fetal medicine.  Drs. Daftary and Sibai have researched and published extensively on complications of preeclampsia.  Their testimony was also consistent with the American College of Obstetrics and Gynecology Task Force on Hypertension and Pregnancy's recommendations published in its Preeclampsia Management and Prognosis bulletin.[1]

"The power to reverse on 'manifest weight' grounds should only be used in exceptional circumstances, when 'the evidence weighs heavily against the' " trial court's judgment.  *Caldwell v. Ohio State Univ.*, 10th Dist. No. 01AP-997, 2002-Ohio-2393, ¶ 59, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).  This case does not present such exceptional circumstances.  There were three expert witnesses that opined on what caused Stephanie's arrythmia. Two of the three experts agreed that her arrythmia was caused by preeclampsia with severe features. Those two experts have more advanced training, research, and experience than the one expert who opined that her arrythmia was caused by an eclamptic seizure.  Moreover, there were five doctors that testified on the standard of care for administering magnesium sulfate for a seizure prophylaxis, and four out of five doctors testified that the standard of care is to deliver magnesium sulfate only during the intrapartum and postpartum period.[2]

As the finder of fact in this bench trial, the Court of Claims was the sole judge of witness credibility and of the weight to accord to the evidence presented. *State v. Madison*,

---

[1] The American College of Obstetrics and Gynecology Task Force on Hypertension and Pregnancy's recommendations, published in its Preeclampsia Management and Prognosis bulletin, stated, "[f]or patients with preeclampsia with features of severe disease * * * we recommend *intrapartum and postpartum* seizure prophylaxis with magnesium sulfate."  (Emphasis added.)

[2] Dr. Bell also testified that she was trained to order magnesium sulfate intrapartum and postpartum for seizure prophylaxis. (Apr. 13, 2022 Tr. at 566).

10th Dist. No. 92AP-1461, 1993 Ohio App. LEXIS 3216, *14 (June 22, 1993), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967).  Competent, credible evidence supports the trial court's judgment, and review of the record does not establish that the trial court, as the trier of fact, "clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *Thompkins* at 387.

For these reasons, I cannot reach the majority's decision without inappropriately reweighing the evidence. Therefore, I respectfully dissent and would affirm the Court of Claims' judgment.

_____